REDACTED PUBLIC VERSION

# EXHIBIT 1

**EFiled:  Aug 07 2017 11:43PM EDT**
**Transaction ID 60951728**
**Case No. 2017-0567-**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOHMEN LIFE SCIENCES SERVICES, LLC, a Wisconsin limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____-____ |
| CORCEPT THERAPEUTICS INCORPORATED, a Delaware Corporation, | ) ) ) ) | CONFIDENTIAL FILING |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT
## FOR DECLARATORY RELIEF AND DAMAGES

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE.**

**If you are not authorized by Court order to view or retrieve this document read no further than this page.  You should contact the following persons:**

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

OF COUNSEL:

Thomas A. Janczewski
Ted A. Wisnefski
Michael Best & Friedrich LLP
100 E Wisconsin Ave #3300
Milwaukee, WI 53202
(414) 271-6560

Gregory V. Varallo (#2242)
Susan M. Hannigan (#5342)
Brian F. Morris (#6235)
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for Plaintiff Dohmen Life
Sciences Services, LLC*

Dated:  August 7, 2017

**A public version of this document will be filed on or before August 10, 2017.**

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DOHMEN LIFE SCIENCES SERVICES, LLC, a Wisconsin limited liability company,<br><br>                Plaintiff,<br><br>    v.<br><br>CORCEPT THERAPEUTICS INCORPORATED, a Delaware Corporation,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. \_\_\_\_\_-\_\_\_<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiff Dohmen Life Science Services, LLC ("DLSS"), by and through its attorneys, Richards, Layton & Finger, P.A. and Michael Best & Friedrich LLP, complains against Defendant Corcept Therapeutics Incorporated ("Corcept") as follows:

### INTRODUCTION

1.      This case arises out of a Pharmaceutical Manufacturer Service Agreement (the "Exclusive Provider Agreement") under which Defendant Corcept contracted to use DLSS as its sole and exclusive provider of clinical and specialty pharmacy services (the "Services") for Defendant Corcept's product Korlym.

2.      Plaintiff DLSS and its predecessor have been providing Corcept with

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

the Services since 2013.

3.      Surveys performed by independent third-parties have consistently reported that patients receiving Korlym have expressed 100% satisfaction with DLSS's exceptional and industry leading services.

4.      DLSS has complied with all of its contractual obligations under the Exclusive Provider Agreement.

5.      DLSS has also achieved or exceeded all Key Performance Indicators under the Exclusive Provider Agreement.

6.      Asserting vague and ill-defined claims of material breach against DLSS, which assertions are baseless and unsubstantiated, Corcept has unilaterally and unlawfully terminated the Exclusive Provider Agreement without providing DLSS with a reasonable opportunity to cure any supposed breach.

7.      Corcept's assertions that DLSS has somehow materially breached the Exclusive Provider Agreement and failed to cure any supposed material breaches are false.  By making vague, inaccurate, and unsubstantiated assertions of material breach against DLSS, and in failing to provide DLSS with the opportunity to cure any supposed material breaches, Corcept is attempting to unilaterally and unlawfully terminate the Exclusive Provider Agreement and avoid its obligations thereunder.

8.      Corcept's predetermined plan to unilaterally terminate the Exclusive

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

Provider Agreement prior to the end of the current term began with Corcept sending DLSS a "Notice of Breach," on June 29, 2017.

9.      In its Notice of Breach, Corcept made only vague and conclusory assertions that DLSS had somehow breached the Exclusive Provider Agreement.

10.     The nebulous Notice of Breach failed to describe how DLSS was to purportedly cure the supposed material breaches.

11.     Without reference to any of the mutually agreed upon Key Performance Indicators set forth in the Exclusive Provider Agreement, Corcept sought the authority to unilaterally and arbitrarily decide for itself whether DLSS's performance under the Exclusive Provider Agreement was acceptable.

12.     Within a week of receiving the "Notice of Breach," DLSS established a multi-disciplinary team to fully investigate Corcept's ill-defined and overly general assertions of breach and verified that Corcept's assertions were unsubstantiated.

13.     Because DLSS strives for client satisfaction, DLSS's President and the CEO of DLSS's parent corporation traveled to Corcept's headquarters to personally meet with Corcept in an effort to understand Corcept's assertions as well as any new requirements that Corcept sought to unilaterally include in the Exclusive Provider Agreement.

14.     More specifically, DLSS directly asked Corcept to provide any new

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

proposed process enhancements that Corcept desired and any new proposed Key

Performance Indicators that Corcept sought to use.

15.     Corcept was unable or unwilling to provide such information to DLSS.

16.     It became apparent in the following weeks that the Notice of Breach

was merely a pretext to terminate the Exclusive Provider Agreement prior to the

expiration of the current term.

17.     Corcept then sent a letter purporting to terminate the Exclusive

Provider Agreement on August 4, 2017, which had been Corcept's true desire all

along.

## The Parties, Jurisdiction, and Venue

18.     DLSS is a limited liability company organized and existing under the

laws of the State of Wisconsin with its principal place of business located at 190

North Milwaukee Street, Milwaukee, Wisconsin 53202.

19.     DLSS traces its roots to 1858, when Friedrich W. Dohmen opened

Wisconsin's first wholesale drug store in Milwaukee.  DLSS has remained family-

owned for the last 159 years and has grown to become a recognized leader in

providing business process outsourcing services to over 400 pharmaceutical and

medical device companies ranging in size from Fortune 50 companies to early start-

up companies.

20.     DLSS provides patient services, financial services, channel support

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

services, regulatory compliance services, and technology services to orphan drug, biopharma, biologic and medical device companies.

21.    Corcept is a publicly-traded corporation organized and existing under laws of the State of Delaware with its principal place of business located at 149 Commonwealth Drive, Menlo Park, California 94025.

22.    Corcept's largest shareholder is Longitude Venture Partners L.P., who invests in life sciences start-ups in an effort to "pursue liquidity opportunities in a manner that optimizes returns to key stakeholders."

23.    The Exclusive Provider Agreement requires that all "legal or equitable action[s] arising out of this Agreement shall be brought exclusively in federal or state court having jurisdiction in Delaware."

24.    Venue is proper in this Court due to the exclusive venue provision in the Exclusive Provider Agreement and because Corcept is a Delaware corporation.

## Background

25.    Corcept manufactures and markets a pharmaceutical drug called Korlym.

26.    Korlym is Corcept's only FDA-approved drug.

27.    The FDA approved Korlym for use by patients with endogenous Cushing Syndrome on February 17, 2012.

28.    Cushing Syndrome is a rare disease that affects 1.2 to 1.7 people per

- 5 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

million.

29.     On May 21, 2013, Corcept contracted with Centric Health Resources, Inc. ("CHR"), a former DLSS affiliate which was subsequently merged with and into DLSS, to be the exclusive provider of a suite of services related to Korlym distribution.  A complete and accurate copy of the Exclusive Provider Agreement is attached and incorporated herein as **EXHIBIT A**.

30.     Under the Exclusive Provider Agreement, DLSS provides specialty pharmacy services; patient intake, access and reimbursement services; patient support services; claims management and collections services; and finance and inventory reporting services on behalf of and for the benefit of Corcept as described in the exhibits to the Exclusive Provider Agreement.

31.     The Exclusive Provider Agreement defines these services as the "Program."

32.     The Exclusive Provider Agreement provides for an initial term of three years and automatic renewal for additional three year terms, unless either party gives written notice of non-renewal at least 180 days before the expiration of the current term.

33.     As evidence of Corcept's satisfaction with DLSS's exemplary service, Corcept renewed the Exclusive Provider Agreement effective June 24, 2016.

34.     The current term of the Exclusive Provider Agreement is set to expire

- 6 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

on June 24, 2019.

35.     Section 5.2.2 provided that the Exclusive Provider Agreement could be terminated for cause if either party committed a "material breach":

> This Agreement may be terminated by the non-breaching party giving written notice of such termination to the other party if the other party breaches a material provision of this Agreement (which includes the obligation to comply with SOPs) and such breach remains uncured for thirty (30) days . . . following the breaching party's receipt of written notice of such breach from the non-breaching party.

36.     The Exclusive Provider Agreement does not further define what is a "material provision" of the Exclusive Provider Agreement.

37.     The Exclusive Provider Agreement was amended in July 2013, with an effective date of May 16, 2013.  A complete and accurate copy of the First Amendment is attached and incorporated herein as **EXHIBIT B**.

38.     At the request of Corcept, the First Amendment added certain "Key Performance Indicators" (or "KPIs") to the Exclusive Provider Agreement to provide a measurable goal and objective for a successful Program.

39.     If DLSS met the KPI targets, Corcept agreed to pay DLSS specified performance bonuses.

40.     If, however, DLSS did not meet the KPI targets, Corcept could exercise certain rights including termination of the Exclusive Provider Agreement.

41.     The parties executed a Second Amendment to the Exclusive Provider

- 7 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

Agreement on October 6, 2014.  A complete and accurate copy of the Second Amendment is attached and incorporated herein as **EXHIBIT C**.

42.     Among other things, the Second Amendment acknowledged DLSS as a "successor in interest" to CHR.

43.     The Exclusive Provider Agreement requires the application of Missouri law to its interpretation and performance.

44.     To effectuate the Program, DLSS used its proprietary Standard Operating Procedures ("SOPs") which are based upon DLSS's extensive industry experience and know-how.

45.     DLSS also developed proprietary SOPs specific to the Program itself.

46.     Under the Program and in accordance with the SOPs, Corcept would consign and deliver Korlym to DLSS, and DLSS would handle (on behalf of and for the benefit of Corcept) all of the patient enrollment and consultation, claims submissions, product distribution, and collections of payments from payers (including insurers and Medicare/Medicaid programs) and co-pays from patients.

47.     Although DLSS would come into possession of the Korlym tablets, Corcept retained title to the Korlym tablets until the patients physically took possession of the tablets.

48.     As part of the Program, DLSS managed the relationship with payers.

49.     Corcept would provide DLSS with a range of prices for Korlym and

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

task DLSS with negotiating with Pharmacy Benefit Managers ("PBMs") and payers to establish the prices that PBMs and payers would pay for Korlym.

50.     In addition, DLSS would negotiate with PBMs and payers to establish criteria for determining when PBMs and payers would approve of and pay for a Plan participant's use of Korlym.

51.     Korlym often costs tens of thousands of dollars per month per patient depending on a number of factors.

52.     Given these costs, payers and PBMs impose an intense and exacting process in determining whether to approve Korlym claims.

53.     The intense and exacting claims approval process, however, can result in delays that are out of DLSS's control.

54.     DLSS also worked one-on-one with patients to educate and assist patients on coverage, co-pay, co-insurance, and deductible responsibilities.

55.     On June 30, 2017, Corcept sent DLSS a Notice of Breach.  A complete and accurate copy of the Notice of Breach is attached and incorporated herein as **<u>EXHIBIT D</u>**.

56.     The Notice of Breach asserted that DLSS committed various "material breaches" of the Exclusive Provider Agreement.

57.     Corcept, however, has conducted annual quality reviews of DLSS, and has never previously reported any deficiency or observation of material concern.

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

58.     Conspicuously, the Notice of Breach did not assert that DLSS failed to meet any of the Key Performance Indicators, which the parties agreed would be the basis in the Exclusive Provider Agreement as a measurable goal and objective for a successful Program.

59.     The Notice of Breach also did not directly assert that DLSS failed to follow any SOPs; rather the Notice of Breach asserted that Corcept *could not determine* whether DLSS was complying with the SOPs.

60.     Prior to entering the Exclusive Provider Agreement, and as part of the annual quality audit, DLSS made all of its SOPs available to Corcept upon request.

61.     Corcept has never identified any purported deficiencies with DLSS's SOPs.

62.     At all times DLSS has been in material compliance with the SOPs.

63.     Indeed, Corcept recently audited DLSS's SOPs and found no material issues.

64.     The Notice of Breach instead focused on a list of vague, generalized grievances and cherry-picked anecdotes to prop up its false assertions that DLSS committed a material breach.

65.     For example, the Notice of Breach asserted that DLSS engaged in poor inventory tracking and mismanagement of inventory.

66.     In fact, DLSS engages independent third-party auditors to conduct

- 10 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

annual Service Organization Control Type 1 ("SOC-1") audits, and such independent, third-party auditors have reported no deficiencies in DLSS's inventory processes and systems.

67.     DLSS has performed consistently at or above recognized industry benchmarks for inventory accuracy.

68.     As another example, the Notice of Breach asserted that DLSS was unable to recover shipments lost by the freight carrier.

69.     Pursuant to Section 8.8(b) of the Exclusive Services Agreement, Corcept has the right to select its preferred freight.

70.     Further, Corcept agreed that DLSS is only responsible for Korlym during the time Korlym is in the custody of DLSS, and that Corcept's sole recourse for delay in the delivery of Korlym while in transit is an action against the freight carrier.

71.     In fact, under Section 8.8(b) of the Exclusive Services Agreement, Corcept waived and released DLSS of all freight claims.

72.     Nevertheless, DLSS worked with Corcept's selected freight carrier to recover lost packages.

73.     In reality, however, the freight carrier has not lost any Korlym shipments in 2017 and only two shipments in 2016, both of which were recovered and returned.

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

74.     The Notice of Breach expressed unfounded concerns that DLSS would be unable adequately to track Korlym in the event of a hypothetical product recall.

75.     To the contrary, DLSS quality personnel have successfully conducted simulated recalls on an annual basis.

76.     The Notice of Breach expressed unfounded concerns that DLSS was unprepared to comply with FDA regulations promulgated under the Drug Supply Chain Security Act.

77.     These regulations do not become effective until late 2017; nevertheless, DLSS has fully developed a solution ready for implementation and has contacted Corcept regarding implementation for Korlym.

78.     The Notice of Breach asserted that, in Corcept's view, DLSS had not obtained "prior authorizations" from payers in a timely enough manner.

79.     The Exclusive Provider Agreement does not specify a target for prior authorization approval nor is it a Key Performance Indicator.

80.     The current average turn-around time for prior authorization by payers for Korlym stands at a mere 11.5 days.

81.     Despite the increasingly complex requirements imposed by PBMs and relevant payers, and despite the increasing volume of claims submissions, DLSS has actually shortened the average turn-around time for prior authorizations, year over year.

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

82.     The speed of prior authorization is driven by the PBMs' and payers' responsiveness or lack thereof —not DLSS.

83.     The Notice of Breach also asserted that, in Corcept's view, DLSS was not diligently pursuing medical appeals of insurance coverage denials of Korlym claims.

84.     The Exclusive Provider Agreement does not specify a standard or targeted time by which to process medical appeals nor is it a Key Performance Indicator.

85.     Moreover, DLSS has been following Corcept's *own* SOP in pursuing medical appeals.

86.     DLSS was diligent in pursuing medical appeals.

87.     Again, the speed at which payers process those appeals is largely out of DLSS's control.

88.     The Notice of Breach asserted that DLSS mismanaged claim submission, resubmission and collections.

89.     Contrary to Corcept's assertions, DLSS has achieved an extraordinary success rate in expected reimbursement amounts versus actual reimbursement amounts.

90.     Further, DLSS has achieved an exceptional collection success rate.

91.     The Notice of Breach also asserted that DLSS's financial reporting was

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

somehow inaccurate or flawed such that it constituted a material breach of the Exclusive Provider Agreement.

92.     In fact, DLSS generates six daily reports, of which Corcept approved the basic content and format.

93.     Moreover, an outside audit confirmed that DLSS's financial reporting performance was consistently accurate and reliable.

94.     The Notice of Breach also insinuated that DLSS somehow violated Missouri pharmacy laws.

95.     In fact, the Missouri Board of Pharmacy audited DLSS in May 2017 and reported *no findings or observations* related to policies, procedures, inventory, storage, distribution or dispensing records.

96.     DLSS promptly responded to the Notice of Breach, by letter dated July 3, 2017 from the CEO of DLSS's parent corporation.  A complete and accurate copy of the Response Letter is attached and incorporated herein as **EXHIBIT E**.

97.     On July 12, 2017 the CEO of DLSS's parent corporation and the President of DLSS, met with Charlie Robb, Corcept's CFO, and Sean Maduck, Corcept's Senior-Vice President Commercial in San Francisco (the "July 12 Meeting").

98.     Although the assertions in the Notice of Breach were false, DLSS nevertheless wanted to understand any concerns that Corcept had and to address

- 14 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

any of Corcept's new expectations that were not expressed in the Exclusive Provider Agreement.

99.     At all times, DLSS was willing and eager to meet any reasonable new expectations of Corcept that were not expressed in the Exclusive Provider Agreement.

100.    During the July 12 Meeting, the parties went through the Notice of Breach, point-by-point.  A complete and accurate copy of DLSS's presentation is attached and incorporated herein as **EXHIBIT F**.

101.    Corcept was unable to refute DLSS's evidence of full compliance with the requirements of the Exclusive Provider Agreement.

102.    At each point, DLSS directly asked Corcept specifically what Corcept would like DLSS to do differently, what new policies or SOPs Corcept would like DLSS to implement, and how DLSS should resolve any purported concerns and "cure" any supposed breaches.

103.    Corcept was unable to identify with any reasonable specificity how Corcept could possibly be satisfied.

104.    It became apparent that Defendant's wrongful termination of the Exclusive Provider Agreement was a foregone conclusion.

105.    On information and belief, the Notice of Breach and the sham "cure period" were merely pretexts to wrongfully terminate the Exclusive Provider

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

Agreement to avoid Corcept's ongoing obligations under the Exclusive Provider Agreement.

106.   This suspicion was confirmed in a follow-up meeting between DLSS's President and Sean Maduck, Corcept's Senior-Vice President Commercial on July 18, 2017 in Denver, and in follow-up telephone calls and correspondence.

107.   During the supposed "cure period" Corcept spoke of a replacement service provider whose name Corcept would not reveal, insinuating the Corcept's decision to terminate the Exclusive Provider Agreement was predetermined.

108.   On August 4, 2017, Corcept improperly and unlawfully terminated the Exclusive Provider Agreement in violation of its own terms.  A complete and accurate copy of the termination letter is attached and incorporated herein as **EXHIBIT G**.

109.   Within two hours, Corcept sent a letter to DLSS directing DLSS to perform post-termination "transitional services."  A complete and accurate copy of the transition letter is attached and incorporated herein as **EXHIBIT H**.

110.   DLSS responded to both letters on August 7, 2017.  A complete and accurate copy of the response letter is attached and incorporated herein as **EXHIBIT I**.

## COUNT I: Declaratory Judgment

111.   DLSS incorporates the preceding paragraphs as if fully set forth herein.

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

112.   DLSS and Corcept entered into the Exclusive Provider Agreement, including the amendments thereto, a valid, enforceable contract supported by adequate consideration, which is attached to this Complaint as Exhibits A, B, and C.

113.   DLSS and Corcept dispute the meaning of the Exclusive Provider Agreement.

114.   A real and justiciable controversy exists between DLSS and Corcept regarding the interpretation and application of the Exclusive Provider Agreement as evidenced by, among other things Exhibits D-I.

115.   DLSS is entitled to a legal declaration stating that:

    a.  DLSS has not materially breached the Exclusive Provider Agreement;

    b.  Corcept has wrongfully terminated the Exclusive Provider Agreement; and

    c.  To the extent that the Exclusive Provider Agreement is terminated, DLSS has no further service obligations.

## COUNT II: Breach of Contract

116.   DLSS incorporates the preceding paragraphs as if fully set forth herein.

117.   DLSS and Corcept entered into the Exclusive Provider Agreement, a valid, enforceable contract supported by adequate consideration, which is attached

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

to this Complaint as Exhibits A, B, and C.

118.   DLSS performed and fulfilled its obligations under the Exclusive Provider Agreement.

119.   Corcept breached the Exclusive Provider Agreement by, among other things:

    a.   Wrongfully terminating the Exclusive Provider Agreement prior to its expiration;

    b.   Breaching its duties under the contract by refusing to disclose to DLSS what steps Corcept wanted DLSS to take or what Key Performance Indicators Corcept wanted DLSS to satisfy in order to "cure" the supposed breaches, thus frustrating DLSS's ability to avail itself of its contractual right to cure; and

    c.   Breaching the implied duty of good faith and fair dealing by forcing DLSS to participate in a sham cure period.

120.   As a direct and proximate result of the above breaches, DLSS has suffered damages.

121.   DLSS is entitled to compensatory damages in an amount to be determined at trial.

**WHEREFORE**, DLSS respectfully requests that the Court enter its Orders, Judgments, and Decrees:

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

a.        Declaring that DLSS has not materially breached the Exclusive Provider Agreement;

b.        Declaring that Corcept has wrongfully terminated the Exclusive Provider Agreement;

c.        Declaring that to the extent that the Exclusive Provider Agreement is terminated, DLSS has no further service obligations;

d.        Decreeing that Corcept specifically perform the Exclusive Provider Agreement, or in the alternative, ordering payments of damages in an amount to be determined at trial;

e.        Awarding DLSS attorneys' fees and costs as allowed by the Exclusive Provider Agreement;

f.        Awarding DLSS pre- and post-judgment interest as provided by law; and

g.        Awarding all such further relief that the Court deems just and equitable.

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

—

/s/ Susan M. Hannigan
_____

Gregory V. Varallo (#2242)

OF COUNSEL:                       Susan M. Hannigan (#5342)

                                 Brian F. Morris (#6235)

Thomas A. Janczewski             Richards, Layton & Finger, P.A.

Ted A. Wisnefski                 920 N. King Street

Michael Best & Friedrich LLP     Wilmington, DE  19801

100 E Wisconsin Ave #3300        (302) 651-7700

Milwaukee, WI 53202

(414) 271-6560                   *Attorneys for Plaintiff Dohmen Life
                                 Sciences Services, LLC*


Dated:  August 7, 2017

- 20 -

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.**

REDACTED PUBLIC VERSION

# EXHIBIT 2

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOHMEN LIFE SCIENCE SERVICES, LLC, a Wisconsin limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0567-TMR |
| CORCEPT THERAPEUTICS INCORPORATED, a Delaware Corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED AMENDED COMPLAINT FOR INJUNCTION, DECLARATORY RELIEF, SPECIFIC PERFORMANCE, AND DAMAGES

Plaintiff Dohmen Life Science Services, LLC ("DLSS"), by and through its attorneys, Richards, Layton & Finger, P.A. and Michael Best & Friedrich LLP, complains against Defendant Corcept Therapeutics Incorporated ("Corcept") as follows:

## INTRODUCTION

1.     This case arises out of a Pharmaceutical Manufacturer Service Agreement (the "Exclusive Provider Agreement") under which Defendant Corcept contracted to use DLSS as its sole and exclusive provider of clinical and specialty pharmacy services (the "Services") for Corcept's product Korlym.

2.     Plaintiff DLSS and its predecessor have been providing Corcept with the Services since 2013.

3.     Surveys performed by independent third-parties have consistently reported that patients receiving Korlym have expressed 100% satisfaction with DLSS's exceptional and industry leading services.

4.     DLSS has complied with all of its contractual obligations under the Exclusive Provider Agreement.

5.     DLSS has also achieved or exceeded all Key Performance Indicators under the Exclusive Provider Agreement.

6.     Nevertheless, at some point prior to March 2017, Corcept began secretly negotiating with DLSS's competitor, Optime Care ("Optime"), to enter a new provider agreement with Optime.

7.     Optime, a newly formed competitor to DLSS, did not at that time have the necessary protocols and systems in place to effectively serve Corcept.

8.     So Corcept, again in secret, coached Optime regarding how to design its systems and protocols using DLSS's industry leading, proprietary systems and protocols as templates.  Corcept eventually determined that Optime was ready to take over as Corcept's new exclusive service provider.

9.     Corcept had only one problem remaining—it was bound by the Exclusive Provider Agreement.

10.     Thus, Corcept schemed to unlawfully terminate the Exclusive Provider Agreement by falsely accusing DLSS of a vague "material breach" of the Exclusive Provider Agreement.

11.     Asserting vague and ill-defined claims of material breach against DLSS, which assertions are baseless and unsubstantiated, Corcept has unilaterally and unlawfully terminated the Exclusive Provider Agreement without providing DLSS with a reasonable opportunity to cure any supposed breach.

12.     Corcept's assertions that DLSS has somehow materially breached the Exclusive Provider Agreement and failed to cure any supposed material breaches are false. By making vague, inaccurate, and unsubstantiated assertions of material breach against DLSS, and in failing to provide DLSS with the opportunity to cure any supposed material breaches, Corcept is attempting to unilaterally and unlawfully terminate the Exclusive Provider Agreement and avoid its obligations thereunder.

13.     Corcept's predetermined plan to unilaterally terminate the Exclusive Provider Agreement prior to the end of the current term began with Corcept sending DLSS a "Notice of Breach," on June 29, 2017.

14.     In its Notice of Breach, Corcept made only vague and conclusory assertions that DLSS had somehow breached the Exclusive Provider Agreement.

15.     The nebulous Notice of Breach failed to describe how DLSS was to purportedly cure the supposed material breaches.

16.     Without reference to any of the mutually agreed upon Key Performance Indicators set forth in the Exclusive Provider Agreement, Corcept sought the authority to unilaterally and arbitrarily decide for itself whether DLSS's

performance under the Exclusive Provider Agreement was acceptable.

17.    Within a week of receiving the "Notice of Breach," DLSS established a multi-disciplinary team to fully investigate Corcept's ill-defined and overly general assertions of breach and verified that Corcept's assertions were unsubstantiated.

18.    Because DLSS strives for client satisfaction, DLSS's President and the CEO of DLSS's parent corporation traveled to Corcept's headquarters to personally meet with Corcept in an effort to understand Corcept's assertions as well as any new requirements that Corcept sought to unilaterally include in the Exclusive Provider Agreement.

19.    More specifically, DLSS directly asked Corcept to provide any new proposed process enhancements that Corcept desired and any new proposed Key Performance Indicators that Corcept sought to use.

20.    Corcept was unable or unwilling to provide such information to DLSS.

21.    It became apparent in the following weeks that the Notice of Breach was merely a pretext to terminate the Exclusive Provider Agreement prior to the expiration of the current term.

22.    Corcept then sent a letter purporting to terminate the Exclusive Provider Agreement on August 4, 2017, which had been Corcept's true desire all along.

23.    Corcept's breaches have resulted in direct damages to DLSS of over

$13 million.

24.     Since Corcept's unilateral termination, DLSS has come into possession of approximately $12.5 million to date which if not for Corcept's breaches of the Exclusive Provider Agreement would be accounts payable to Corcept.

25.     DLSS is entitled to an offset under Missouri law (which governs the contract) from this amount for DLSS's damages directly caused by Corcept's unilateral and unlawful termination.

26.     Nevertheless, rather than exercise a self-help remedy to offset, DLSS placed the disputed funds into escrow which is available to be paid out at the end of this case as this Court directs.

27.     Under the terms of the escrow agreement, the escrow funds may be released by only upon agreement between DLSS and Corcept, or a "written order of the Delaware Chancery Court before which the Pending Litigation is pending, specifying the disbursement of all or a portion of the Escrow.".

**The Parties, Jurisdiction, and Venue**

28.     DLSS is a limited liability company organized and existing under the laws of the State of Wisconsin with its principal place of business located at 190 North Milwaukee Street, Milwaukee, Wisconsin 53202.

29.     DLSS traces its roots to 1858, when Friedrich W. Dohmen opened Wisconsin's first wholesale drug store in Milwaukee. DLSS has remained family-owned for the last 159 years and has grown to become a recognized leader in

providing business process outsourcing services to over 400 pharmaceutical and medical device companies ranging in size from Fortune 50 companies to early start-up companies.

30.   DLSS provides patient services, financial services, channel support services, regulatory compliance services, and technology services to orphan drug, biopharma, biologic and medical device companies.

31.   Corcept is a publicly-traded corporation organized and existing under laws of the State of Delaware with its principal place of business located at 149 Commonwealth Drive, Menlo Park, California 94025.

32.   Corcept manufactures and markets a pharmaceutical drug called Korlym, which is Corcept's only FDA-approved drug.

33.   The FDA approved Korlym for use by patients with endogenous Cushing Syndrome, a rare disease that affects 1.2 to 1.7 people per million.

34.   Corcept's largest shareholder is Longitude Venture Partners L.P., who invests in life sciences start-ups in an effort to "pursue liquidity opportunities in a manner that optimizes returns to key stakeholders."

35.   The Exclusive Provider Agreement requires that all "legal or equitable action[s] arising out of this Agreement shall be brought exclusively in federal or state court having jurisdiction in Delaware."

36.   Venue is proper in this Court due to the exclusive venue provision in the Exclusive Provider Agreement and because Corcept is a Delaware corporation.

## Background

I.   The Exclusive Provider Agreement.

37.   On May 21, 2013, Corcept contracted with Centric Health Resources,

Inc. ("CHR"), a former DLSS affiliate which was subsequently merged with and

into DLSS, to be the exclusive provider of a suite of services related to Korlym

distribution.  A complete and accurate copy of the Exclusive Provider Agreement is

attached and incorporated herein as **EXHIBIT A**.

38.   Under the Exclusive Provider Agreement, DLSS provides specialty

pharmacy services; patient intake, access and reimbursement services; patient

support services; claims management and collections services; and finance and

inventory reporting services on behalf of and for the benefit of Corcept as described

in the exhibits to the Exclusive Provider Agreement.

39.   The Exclusive Provider Agreement defines these services as the

"Program."

40.   At the request of Corcept, the parties entered a First Amendment that

added certain "Key Performance Indicators" (or "KPIs") to the Exclusive Provider

Agreement to provide a measurable goal and objective for a successful Program.

The KPIs included both "targets" and "thresholds."   A complete and accurate copy

of the First Amendment is attached and incorporated herein as **EXHIBIT B**.

41.   If DLSS met the KPI targets, Corcept agreed to pay DLSS specified

performance bonuses.

42.     If, however, DLSS did not meet the KPI thresholds, Corcept could exercise certain rights including termination of the Exclusive Provider Agreement.

43.     The parties executed a Second Amendment to the Exclusive Provider Agreement on October 6, 2014.  Among other things, the Second Amendment acknowledged DLSS as a "successor in interest" to CHR.  A complete and accurate copy of the Second Amendment is attached and incorporated herein as **EXHIBIT C**.

II.     Term, Termination, and Choice of Law Provisions.

44.     The Exclusive Provider Agreement provides for an initial term of three years and automatic renewal for additional three year terms, unless either party gives written notice of non-renewal at least 180 days before the expiration of the current term.

45.     As evidence of Corcept's satisfaction with DLSS's exemplary service, Corcept renewed the Exclusive Provider Agreement effective June 24, 2016.

46.     The current term of the Exclusive Provider Agreement is set to expire on June 24, 2019.

47.     Section 5.2.2 provided that the Exclusive Provider Agreement could be terminated for cause if either party committed a "material breach":

> This Agreement may be terminated by the non-breaching party giving written notice of such termination to the other party if the other party breaches a material provision of this Agreement (which includes the obligation to comply with SOPs) and such breach remains uncured for thirty (30) days . . . following the breaching party's receipt of written

notice of such breach from the non-breaching party.

48.     The Exclusive Provider Agreement does not further define what is a "material provision" of the Exclusive Provider Agreement.

III.     The "Program."

49.     To effectuate the Program, DLSS used its proprietary Standard Operating Procedures ("SOPs") which are based upon DLSS's extensive industry experience and know-how.

50.     DLSS also developed proprietary SOPs specific to the Program itself.

51.     Under the Program and in accordance with the SOPs, Corcept would consign and deliver Korlym to DLSS, and DLSS would handle (on behalf of and for the benefit of Corcept) all of the patient enrollment and consultation, claims submissions, product distribution, and collections of payments from payers (including insurers and Medicare/Medicaid programs) and co-pays from patients.

52.     Although DLSS would come into possession of the Korlym tablets, Corcept retained title to the Korlym tablets until the patients physically took possession of the tablets.

53.     As part of the Program, DLSS managed the relationship with payers.

54.     Corcept would provide DLSS with a range of prices for Korlym and task DLSS with negotiating with Pharmacy Benefit Managers ("PBMs") and payers to establish the prices that PBMs and payers would pay for Korlym.

55.   In addition, DLSS would negotiate with PBMs and payers to establish criteria for determining when PBMs and payers would approve of and pay for a Plan participant's use of Korlym.

56.   Korlym often costs tens of thousands of dollars per month per patient depending on a number of factors.

57.   Given these costs, payers and PBMs impose an intense and exacting process in determining whether to approve Korlym claims.

58.   The intense and exacting claims approval process, however, can result in delays that are out of DLSS's control.

59.   DLSS also worked one-on-one with patients to educate and assist patients on coverage, co-pay, co-insurance, and deductible responsibilities.

60.   Section 7.1 of the Exclusive Provider Agreement states that:

Subject to Section 7.3 below, CHR [now DLSS] and Client hereby expressly agree that, as between CHR and Client, the Program and all intellectual property, work product, software, systems, data, ideas, developments, know-how, disclosures, other information, inventions, creations, programs, firmware, records, all embodiments of the foregoing and all modifications, improvements and enhancements and the data mode collected, created or developed as a result of or related to the Program or in the course of performing the Services and all patents, copyrights and other proprietary rights therein or based thereon, of any nature created or developed in connection with this Agreement, and all other results and proceeds of the Services, shall be owned exclusively by CHR.

61.   Section 7.3 of the Exclusive Provider Agreement, in turn, governed the use of Corcept's trademarks.

62.     During the performance of the Program, DLSS shared with Corcept the

property described in Paragraph 60 (hereinafter, the "DLSS Program Property").

63.     Section 6.1 of the Exclusive Provider Agreement defined the term

"Confidential Information":

> As used in this Agreement, the term "Confidential Information" shall
> mean any and all trade secrets and other confidential information
> disclosed by a party (the "Disclosing Party"). "Confidential
> Information" shall include, without limitation, any information
> concerning the Disclosing Party's business plan, processes and
> methods, product or process specifications and designs, inventions,
> technical know-how, business and marketing plans, financial
> information, customer data, research and development activities and
> other materials or information relating to its business or activities
> which are not generally known to the public, all confidential
> information of third-parties in the possession of the Disclosing Party;
> and all notes, analysis, compilations, studies, summaries and other
> material prepared by or for the Disclosing Party containing or based,
> in whole or in part, on any information included in the foregoing.

64.     Section 6.2 of the Exclusive Provider Agreement prohibited both

parties from sharing confidential information with third parties:

> the Receiving Party shall keep the Disclosing Party's Confidential
> Information confidential (whether such Confidential Information was
> disclosed to the Receiving Party before, on or after the Effective Date)
> and shall not disclose, or permit the disclosure of, any Confidential
> Information to any third party without the prior consent of the
> Disclosing Party. . . .

65.     Section 6.2 of the Exclusive Provider Agreement also prohibited both

parties from in any way using the other party's Confidential Information "without

the prior consent of the Disclosing Party, for any purpose other than in connection

with the proper performance of the Receiving Party's obligations under this

Agreement."

66.     Section 6.2 of the Exclusive Provider Agreement further states: "The Receiving Party acknowledges and agrees that the Disclosing Party considers the Confidential Information to be valuable, confidential and a trade secret."

IV.     Corcept Secretly Negotiates with Optime.

67.     Sometime between June 24, 2016 and early March of 2017, Corcept began secretly negotiating with Optime to terminate the Exclusive Provider Agreement and enter a new agreement with Optime.

68.     Optime was a newly formed corporation and Corcept was Optime's first ever customer.

69.     Thus, Corcept worked behind the scenes to coach Optime in designing, among other things, Optime's claims and inventory reporting systems.

70.     Corcept used DLSS's propriety systems and SOPs as a template to assist Optime in designing Optime's own systems.

71.     During this process, Corcept shared with Optime DLSS's "intellectual property," "work product," "systems," and "data" described in Section 7.1 of the Agreement.

72.     In addition, Corcept shared with Optime DLSS's "Confidential Information," as defined by Section 6.1 of the Agreement.

73.     As just one example, on Wednesday, April 12, 2017, Amy Hanstein, Corcept's Cost Accounting Manager sent an email to Tina Pheasant, Vice President

of IT Pharmacy Services, in which Hanstein requested modification to Optime's mock-up reports.

74.    In this email, Hanstein revealed that she "tried to bring this up on our call approximately a month ago, but you said this would have to be a phase 2, *because you were only copying the existing reports*."

75.    The "existing reports" that Optime was "copying" were developed by DLSS.

76.    The "existing reports" that Optime was "copying" are owned by DLSS pursuant to Section 7.1 of the Exclusive Provider Agreement.

77.    The "existing reports" that Optime was "copying" were Confidential Information of DLSS as defined in Section 6.1 of the Exclusive Provider Agreement.

78.    Obviously, DLSS did not disclose the "existing reports" to Optime.

79.    Corcept disclosed the "existing reports," and other DLSS Program Property and DLSS Confidential Information, to Optime with the intent that Optime "copy" them.

V.    The Sham Notice of Breach and Opportunity to Cure.

80.    Once Corcept became comfortable that Optime was ready to serve as Corcept's exclusive service provider, Corcept contrived a way to terminate the Exclusive Provider Agreement.

81.    This process was a pretext and a sham, Corcept had already selected a

new service provider without giving DLSS an opportunity to cure.

82.    On June 29, 2017, Corcept sent DLSS a Notice of Breach.  A complete and accurate copy of the Notice of Breach is attached and incorporated herein as **EXHIBIT D**.

83.    The Notice of Breach asserted that DLSS committed various "material breaches" of the Exclusive Provider Agreement.

84.    Corcept, however, has conducted annual quality reviews of DLSS, and has never previously reported any deficiency or observation of material concern.

85.    Conspicuously, the Notice of Breach did not assert that DLSS failed to meet any of the Key Performance Indicators, which the parties agreed would be the basis in the Exclusive Provider Agreement as a measurable goal and objective for a successful Program.

86.    The Notice of Breach also did not directly assert that DLSS failed to follow any SOPs; rather the Notice of Breach asserted that Corcept *could not determine* whether DLSS was complying with the SOPs.

87.    Prior to entering the Exclusive Provider Agreement, and as part of the annual quality audit, DLSS made all of its SOPs available to Corcept upon request.

88.    Corcept has never identified any purported deficiencies with DLSS's SOPs.

89.    At all times DLSS has been in material compliance with the SOPs.

90.    Indeed, Corcept recently audited DLSS's SOPs and found no material

issues.

91.     The Notice of Breach instead focused on a list of vague, generalized grievances and cherry-picked anecdotes to prop up its false assertions that DLSS committed a material breach.

92.     For example, the Notice of Breach asserted that DLSS engaged in poor inventory tracking and mismanagement of inventory.

93.     In fact, DLSS engages independent third-party auditors to conduct annual Service Organization Control Type 1 ("SOC-1") audits, and such independent, third-party auditors have reported no deficiencies in DLSS's inventory processes and systems.

94.     DLSS has performed consistently at or above recognized industry benchmarks for inventory accuracy.

95.     As another example, the Notice of Breach asserted that DLSS was unable to recover shipments lost by the freight carrier.

96.     Pursuant to Section 8.8(b) of the Exclusive Services Agreement, Corcept has the right to select its preferred freight.

97.     Further, Corcept agreed that DLSS is only responsible for Korlym during the time Korlym is in the custody of DLSS, and that Corcept's sole recourse for delay in the delivery of Korlym while in transit is an action against the freight carrier.

98.     In fact, under Section 8.8(b) of the Exclusive Services Agreement,

Corcept waived and released DLSS of all freight claims.

99.    Nevertheless, DLSS worked with Corcept's selected freight carrier to recover lost packages.

100.    In reality, however, the freight carrier has not lost any Korlym shipments in 2017 and only two shipments in 2016, both of which were recovered and returned.

101.    The Notice of Breach expressed unfounded concerns that DLSS would be unable adequately to track Korlym in the event of a hypothetical product recall.

102.    To the contrary, DLSS quality personnel have successfully conducted simulated recalls on an annual basis.

103.    The Notice of Breach expressed unfounded concerns that DLSS was unprepared to comply with FDA regulations promulgated under the Drug Supply Chain Security Act.

104.    These regulations do not become effective until late 2017; nevertheless, DLSS has fully developed a solution ready for implementation and has contacted Corcept regarding implementation for Korlym.

105.    The Notice of Breach asserted that, in Corcept's view, DLSS had not obtained "prior authorizations" from payers in a timely enough manner.

106.    The Exclusive Provider Agreement does not specify a target for prior authorization approval nor is it a Key Performance Indicator.

107.    The current average turn-around time for prior authorization by payers

for Korlym stands at a mere 11.5 days.

108.    Despite the increasingly complex requirements imposed by PBMs and relevant payers, and despite the increasing volume of claims submissions, DLSS has actually shortened the average turn-around time for prior authorizations, year over year.

109.    The speed of prior authorization is driven by the PBMs' and payers' responsiveness or lack thereof —not DLSS.

110.    The Notice of Breach also asserted that, in Corcept's view, DLSS was not diligently pursuing medical appeals of insurance coverage denials of Korlym claims.

111.    The Exclusive Provider Agreement does not specify a standard or targeted time by which to process medical appeals nor is it a Key Performance Indicator.

112.    Moreover, DLSS has been following Corcept's *own* SOP in pursuing medical appeals.

113.    DLSS was diligent in pursuing medical appeals.

114.    Again, the speed at which payers process those appeals is largely out of DLSS's control.

115.    The Notice of Breach asserted that DLSS mismanaged claim submission, resubmission and collections.

116.    Contrary to Corcept's assertions, DLSS has achieved an extraordinary

success rate in expected reimbursement amounts versus actual reimbursement
amounts.

117.    Further, DLSS has achieved an exceptional collection success rate.

118.    The Notice of Breach also asserted that DLSS's financial reporting was
somehow inaccurate or flawed such that it constituted a material breach of the
Exclusive Provider Agreement.

119.    In fact, DLSS generates six daily reports, of which Corcept approved
the basic content and format.

120.    Moreover, an outside audit confirmed that DLSS's financial reporting
performance was consistently accurate and reliable.

121.    The Notice of Breach also insinuated that DLSS somehow violated
Missouri pharmacy laws.

122.    In fact, the Missouri Board of Pharmacy audited DLSS in May 2017
and reported *no findings or observations* related to policies, procedures, inventory,
storage, distribution or dispensing records.

123.    DLSS promptly responded to the Notice of Breach, by letter dated July
3, 2017 from the CEO of DLSS's parent corporation.  A complete and accurate
copy of the Response Letter is attached and incorporated herein as **EXHIBIT E**.

124.    On July 12, 2017 the CEO of DLSS's parent corporation and the
President of DLSS, met with Charlie Robb, Corcept's CFO, and Sean Maduck,
Corcept's Senior-Vice President Commercial in San Francisco (the "July 12

Meeting").

125. Although the assertions in the Notice of Breach were false, DLSS nevertheless wanted to understand any concerns that Corcept had and to address any of Corcept's new expectations that were not expressed in the Exclusive Provider Agreement.

126. At all times, DLSS was willing and eager to meet any reasonable new expectations of Corcept that were not expressed in the Exclusive Provider Agreement.

127. During the July 12 Meeting, the parties went through the Notice of Breach, point-by-point. A complete and accurate copy of DLSS's presentation is attached and incorporated herein as **EXHIBIT F**.

128. Corcept was unable to refute DLSS's evidence of full compliance with the requirements of the Exclusive Provider Agreement.

129. At each point, DLSS directly asked Corcept specifically what Corcept would like DLSS to do differently, what new policies or SOPs Corcept would like DLSS to implement, and how DLSS should resolve any purported concerns and "cure" any supposed breaches.

130. Corcept was unable to identify with any reasonable specificity how Corcept could possibly be satisfied.

131. It became apparent that Defendant's wrongful termination of the Exclusive Provider Agreement was a foregone conclusion.

132.   The Notice of Breach and the sham "cure period" were merely pretexts to wrongfully terminate the Exclusive Provider Agreement to avoid Corcept's ongoing obligations under the Exclusive Provider Agreement.

133.   This suspicion was confirmed in a follow-up meeting between DLSS's President and Sean Maduck, Corcept's Senior-Vice President Commercial on July 18, 2017 in Denver, and in follow-up telephone calls and correspondence.

134.   During the supposed "cure period" Corcept spoke of a replacement service provider whose name Corcept would not reveal at the time, insinuating the Corcept's decision to terminate the Exclusive Provider Agreement was predetermined.

VI.    <u>Corcept Unlawfully Terminates the Exclusive Provider Agreement.</u>

135.   On August 4, 2017, Corcept improperly and unlawfully terminated the Exclusive Provider Agreement in violation of its own terms.  A complete and accurate copy of the termination letter is attached and incorporated herein as **EXHIBIT G**.

136.   Within two hours, Corcept sent a letter to DLSS directing DLSS to perform post-termination "transitional services."  A complete and accurate copy of the transition letter is attached and incorporated herein as **EXHIBIT H**.

137.   DLSS responded to both letters on August 7, 2017.  A complete and accurate copy of the response letter is attached and incorporated herein as **EXHIBIT I**.

138.   In the following days and weeks DLSS cooperated with Corcept and Optime to ensure patient continuity.

139.   DLSS did not, however, waive any of its rights to the significant contract damages that DLSS has incurred as a direct result of Corcept's breach, which total over $13 million, or its ability to seek specific performance on the Exclusive Service Agreement until its scheduled termination in 2019.

140.   In the weeks following Corcept's unilateral and unlawful termination, DLSS uncovered emails, some of which are described in Paragraphs 73–74, showing that Corcept had been plotting with Optime to terminate the Exclusive Provider Agreement since at least March 2017, and likely earlier.

141.   Since Corcept's unilateral termination, DLSS has come into possession of approximately $12.5 million to date which if not for Corcept's breaches of the Exclusive Provider Agreement would be accounts payable to Corcept.

142.   DLSS asserted its rights to an equitable offset and/or equitable recoupment of DLSS' contract damages against DLSS' accounts payable to Corcept.

143.   DLSS placed the disputed funds in escrow with U.S. Bank National Association ("U.S. Bank") pending resolution of this case (the "Escrow Funds"). A complete and accurate copy of the Escrow Agreement is attached and incorporated herein as **EXHIBIT J**.

144.   Under the terms of the Escrow Agreement, the Escrow Funds may be

released by U.S. Bank only upon agreement between DLSS and Corcept, or a "written order of the Delaware Chancery Court before which the Pending Litigation is pending, specifying the disbursement of all or a portion of the Escrow."

145.   For its part, Corcept has represented to the Securities and Exchange Commission, Corcept's shareholders, and to potential investors that DLLS placing the disputed funds in escrow will not "materially affect Corcept's liquidity or its commercial or development activities, regardless of the outcome of the litigation."

## COUNT I: Injunction

146.   DLSS incorporates the preceding paragraphs as if fully set forth herein.

147.   Corcept is in possession of DLSS Program Property.

148.   Corcept is in possession of DLSS Confidential Information.

149.   DLSS Program Property and DLSS Confidential Information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

150.   DLSS undertook reasonable efforts to maintain the secrecy of DLSS Program Property and DLSS Confidential Information.

151.   Corcept has agreed, by contract, that "the Disclosing Party considers the Confidential Information to be valuable, confidential and a trade secret."

152.   Corcept has disclosed DLSS Program Property and DLSS Confidential Information to third parties, including Optime.

153.   Corcept did not have the express or implied consent of DLSS to disclose DLSS Program Property and DLSS Confidential Information to Optime or to any other third party.

154.   DLSS is entitled to possession of DLSS Program Property and DLSS Confidential Information.

155.   The value of DLSS Program Property and DLSS Confidential Information is not easily quantifiable.

156.   DLSS will be irreparably harmed if the DLSS Program Property and DLSS Confidential Information are not returned to DLSS and if Corcept is not prohibited from possessing DLSS's DLSS Program Property and DLSS Confidential Information.

157.   DLSS has no adequate remedy at law.

158.   DLSS is entitled to an injunction, under Mo. Stat. § 417.55, and in equity:

    a. Requiring Corcept to return all DLSS Program Property and DLSS Confidential Information and modifications of DLSS Program Property and DLSS Confidential Information to DLSS;

    b. Prohibiting Corcept from further disclosure or dissemination of DLSS Program Property and DLSS Confidential Information and modifications of DLSS Program Property and DLSS Confidential Information to DLSS;

c. Requiring Corcept to submit to an audit by a third-party computer

forensic firm to confirm compliance of the same.

## COUNT II: Declaratory Judgment

159. DLSS incorporates the preceding paragraphs as if fully set forth herein.

160. DLSS performed and fulfilled its obligations under the Exclusive

Provider Agreement.

161. Corcept breached the Exclusive Provider Agreement by, among other

things:

a. Wrongfully terminating the Exclusive Provider Agreement prior to

its expiration;

b. Misusing DLSS Program Property and DLSS Confidential

Information;

c. Disclosing DLSS Program Property and DLSS Confidential

Information to third parties, including Optime;

d. Breaching its duties under the contract by refusing to disclose to

DLSS what steps Corcept wanted DLSS to take or what Key

Performance Indicators Corcept wanted DLSS to satisfy in order to

"cure" the supposed breaches, thus frustrating DLSS's ability to

avail itself of its contractual right to cure;

e. Breaching the implied duty of good faith and fair dealing by

negotiating with DLSS's competitor prior to giving DLSS an

opportunity to cure any purported "material breach"; and

f. Breaching the implied duty of good faith and fair dealing by forcing DLSS to participate in a sham cure period.

162.   As a direct and proximate result of the above breaches, DLSS has suffered damages estimated to be over $13million.

163.   Since Corcept's unilateral termination, DLSS has come into possession of approximately $12.5 million to date which if not for Corcept's breaches of the EPA would be accounts payable to Corcept.

164.   DLSS asserted its rights to an equitable offset and/or equitable recoupment of DLSS' contract damages against DLSS' accounts payable to Corcept.

165.   DLSS placed the disputed funds in escrow ("Escrow Funds") U.S. Bank pending resolution of this case.

166.   DLSS and Corcept both assert that each has a superior right to the Escrow Funds.

167.   A real and justiciable controversy exists between DLSS and Corcept regarding which party is entitled to the Escrow Funds.

168.   DLSS is entitled to a legal declaration stating that U.S. Bank should pay the Escrow Funds, in their entirety, to DLSS.

## COUNT III: Specific Performance or, in the Alternative, Contract Damages

169.   DLSS incorporates the preceding paragraphs as if fully set forth herein.

170.   DLSS and Corcept entered into the Exclusive Provider Agreement, a valid, enforceable contract supported by adequate consideration, which is attached to this Complaint as Exhibits A, B, and C.

171.   DLSS performed and fulfilled its obligations under the Exclusive Provider Agreement.

172.   Corcept breached the Exclusive Provider Agreement by, among other things:

   a. Wrongfully terminating the Exclusive Provider Agreement prior to its expiration;

   b. Misusing DLSS Program Property and DLSS Confidential Information;

   c. Disclosing DLSS Program Property and DLSS Confidential Information to third parties, including Optime;

   d. Breaching its duties under the contract by refusing to disclose to DLSS what steps Corcept wanted DLSS to take or what Key Performance Indicators Corcept wanted DLSS to satisfy in order to "cure" the supposed breaches, thus frustrating DLSS's ability to avail itself of its contractual right to cure;

   e. Breaching the implied duty of good faith and fair dealing by negotiating with DLSS's competitor prior to giving DLSS an

opportunity to cure any purported "material breach"; and

f.   Breaching the implied duty of good faith and fair dealing by forcing DLSS to participate in a sham cure period.

173.   As a direct and proximate result of the above breaches, DLSS has suffered damages.

174.   The requirement that Corcept afford DLSS an opportunity to cure is definite, certain, and complete.

175.   DLSS has tendered performance, and has demonstrated a willingness to "cure" any supposed "material breach."

176.   DLSS lacks an adequate remedy at law because the damages suffered by DLSS as a result of Corcept and Optime's ongoing use of DLSS Program Property and DLSS Confidential Information is not easily quantifiable.

177.   DLSS is entitled to specific performance, requiring Corcept to rescind the Notice of Termination.

178.   In the alternative, DLSS is entitled to specific performance requiring Corcpet to offer DLSS a bona fide opportunity to cure any supposed "material breach."

179.   In the alternative, DLSS is entitled to compensatory damages in an amount to be determined at trial.

## COUNT IV: Trade Secret Misappropriation

180.   DLSS incorporates the preceding paragraphs as if fully set forth herein.

181.   Corcept is in possession of DLSS Confidential Information.

182.   DLSS shared the DLSS Confidential Information subject to the

Exclusive Provider Agreement whereby:

    a.  Corcept agreed that Corcept would not "disclose, or permit the

       disclosure of, any Confidential Information to any third party

       without the prior consent" of DLSS; and

    b.  Corcept agreed that it would not use the DLSS Confidential

       Information" for any purpose other than in connection with the

       proper performance of the [Corcept's] obligations under this

       Agreement."

183.   DLSS Confidential Information derives independent economic value,

actual or potential, from not being generally known to, and not being readily

ascertainable by proper means by other persons who can obtain economic value

from its disclosure or use.

184.   DLSS undertook reasonable efforts to maintain the secrecy of DLSS

Confidential Information.

185.   Corcept has agreed, by contract, that "the Disclosing Party considers

the Confidential Information to be valuable, confidential and a trade secret."

186.   Corcept has disclosed DLSS Confidential Information to third parties,

including Optime.

187.   Corcept did not have the express or implied consent of DLSS to disclose the DLSS Confidential Information to Optime or to any other third party.

188.   Corcept also used, without authorization, DLSS Confidential Information for improper purposes unrelated to Corcept's performance under the Exclusive Provider Agreement.

189.   DLSS acted with reckless indifference to DLSS's rights in the DLSS Confidential Information.

190.   As a direct and proximate result of Corcept's misappropriation of DLSS Confidential Information, DLSS has suffered damages in an amount to be determined at trial.

**WHEREFORE**, DLSS respectfully requests that the Court enter its Orders, Judgments, and Decrees:

    a.  An injunction,

        i.  Requiring Corcept to return all DLSS Program Property and DLSS Confidential Information and modifications of DLSS Program Property and DLSS Confidential Information to DLSS;

        ii.  Prohibiting Corcept from further disclosure or dissemination of DLSS Program Property and DLSS Confidential Information and modifications of DLSS Program Property

and DLSS Confidential Information to DLSS;

    iii.  Requiring Corcept to submit to an audit by a third-party computer forensic firm to confirm compliance of the same.

b.  Declaring that DLSS is entitled to the Escrow Funds;

c.  Decreeing that Corcept specifically perform the Exclusive Provider Agreement, or in the alternative, ordering payments of damages in an amount to be determined at trial;

d.  Awarding DLSS attorneys' fees and costs as allowed by the Exclusive Provider Agreement;

e.  Awarding DLSS pre- and post-judgment interest as provided by law; and

f.  Awarding all such further relief that the Court deems just and equitable.

/s/ Gregory V. Varallo

OF COUNSEL:

Thomas A. Janczewski
Ted A. Wisnefski
Michael Best & Friedrich LLP
100 E Wisconsin Ave #3300
Milwaukee, WI 53202
(414) 271-6560

Gregory V. Varallo (#2242)
Susan M. Hannigan (#5342)
Brian F. Morris (#6235)
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for Plaintiff Dohmen Life
Sciences Services, LLC*

Dated:  September 27, 2017

# EXHIBITS A-J TO VERIFIED AMENDED COMPLAINT

# REDACTED IN THEIR ENTIRETY